FILED

2006 May-31  PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

LARRY N. NORRIS,                        }
                                        }
        **Plaintiff,**                  }
                                        }
v.                                      }        **Case No.:  2:05-CV-947-RDP**
                                        }
CENTRIX FINANCIAL, LLC,                 }
                                        }
        **Defendant.**                  }

### MEMORANDUM OPINION

Pending before the court is Defendant Centrix Financial, LLC's Motion for Summary Judgment (Doc. #12) filed on April 3, 2006. This discrimination and retaliation case arises out of Plaintiff's former employment as a sales representative with Centrix Financial, LLC ("Defendant"). (Doc. #1). Upon consideration of the record and the relevant law, the court concludes that Defendant's Motion for Summary Judgment is due to be granted, and that Plaintiff's Complaint is due to be dismissed with prejudice.

### STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party cannot present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *see* Fed. R. Civ. P. 56(a) - (b).

Rule 56(e) provides in part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Thus, although a court may not a grant a motion for summary judgment simply because the motion goes unopposed, it may do so if the moving party has shown that there are not disputed issues of material fact and that she is entitled to judgment as a matter of law.

## UNDISPUTED FACTS

Defendant works with various automobile dealerships and financial institutions in Alabama and other states to provide funding for automobile purchases and then services those funding contracts on behalf of the financial institutions. (AF. No. 2).[1] In addition to marketing for new dealership business, Centrix dealer representatives train the dealer finance managers on the terms and conditions of the programs and on the information "stips" that must be obtained from each auto purchaser in order to finance the auto purchases. (AF. No. 4). Local dealer representatives are also

---

[1]The designation "AF" stands for admitted fact and indicates a fact offered by Defendant that Plaintiff has admitted by failing to file any submission contesting such facts, in his deposition testimony, or by virtue of any other evidence offered in support of his case. Whenever Plaintiff has adequately disputed a fact offered by Defendant, the court has accepted Plaintiff's version. The court's numbering of admitted facts (*e.g.*, AF No. 2) corresponds to the numbered paragraphs contained in Movant's Initial Submission of Facts and Relevant Law in Support of It's Motion for Summary Judgment as set forth in Doc. #13. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts. For example, AF No. 22.2 would indicate the second sentence of paragraph 22 of Movant's Initial Submission of Facts and Relevant Law in Support of It's Motion for Summary Judgment. Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

2

responsible for ensuring that dealer finance managers are properly trained to include the "stips" in every package, and for ensuring that the dealerships include the proper "stips" in the customer packages before sending them to Denver. (AF. No. 5). Centrix funders return customer packages that do not contain the appropriate "stips" to the dealerships, and the loans cannot be written until all of the necessary information is obtained. (AF. No. 6). The local Centrix dealer representatives are notified of packages returned to the dealerships in their respective areas and are expected to follow-up with those dealerships to ensure that the "stips" are returned to the funder. (AF. No. 7).

Plaintiff first became employed by Defendant on February 18, 2002 as a dealer representative for Northern Alabama. (AF. No. 8). Plaintiff initially worked a 90-day probation period under his first supervisor, Don Faulkner ("Faulkner"). (AF. No. 9). On May 27, 2002, Faulkner gave Plaintiff a performance review, rating Plaintiff at the low end of the acceptable range and giving him specific goals: (1) to spend more time educating dealerships on the Centrix program; (2) to increase his loan volume; and (3) to work harder at reducing error rates on loans. (AF. No. 10). In January 2003, John Murray ("Murray") became Plaintiff's supervisor and gave Plaintiff his annual performance appraisal in February 2003 specifically noting that Plaintiff, "needs to provide more training to his dealers in order to minimize credit and funding issues. This will increase his funding, capture and efficiency." (AF. No. 11).

In April 2003, Murray received several e-mails from other Centrix employees indicating problems with funding due to Plaintiff's failure to spend training time with his dealer accounts. (AF. No. 12). An investigation revealed to Murray and Human Resources Generalist Heidi Johnson ("Johnson") (Deutschmann at that time) that Plaintiff's call logs showed visits to dealerships that did not take place. (AF. No. 13). A written Employee Counseling Notice ("Notice") was issued by

3

Johnson on May 8, 2003, noting that Plaintiff "hasn't been collecting 'stips' for buyer/funders in a timely manner," and that "it has been communicated to his [the plaintiff's] supervisor that the information contained in the call logs is not accurate." (AF. No. 14). The Notice also stated that Plaintiff would be placed on a 30-day probation and that any further "complaints or infractions will result in additional disciplinary action up to and including termination." (AF. No. 15). During a May 9, 2003 conference call between Plaintiff, Johnson, and Murray to discuss the Notice, Plaintiff agreed that he would work harder at training dealers and follow-up with "stips" on a daily basis. (AF. No. 16). Plaintiff admitted he was counseled in May 2003 about his failure to collect "stips" in a timely manner and his failure to accurately keep his daily call logs. (AF. No. 57). Plaintiff admitted that after this counseling session he understood that Murray was not happy with his performance; that his daily logs needed to be more accurate; and that he was subject to termination for not correcting the problems in the future. (AF. No. 58). The Employee Counseling Notice was subsequently sent to Plaintiff for his signature, and in his reply Plaintiff denied falsifying the call logs and stated, "But I now understand that the call logs need to be done with complete accuracy." (AF. No. 17).

In a June 19, 2003 conference call held between Plaintiff, Murray, and Johnson, Plaintiff agreed to sign-off on all funding packages from "problem dealerships" before those packages were sent to the funders . (AF. No. 18). On June 23, 2003, Murray issued a memorandum to all of the dealer representatives in his area listing each dealer representative's "problem dealerships" and advising the dealer representatives that they were required to sign off on funding packages. (AF. No. 19). In the months of July and August 2003, Murray and Wes Hart ("Hart"), Vice President of National Sales, sent several e-mails to Plaintiff advising him that he needed lower "stip" error ratios

4

to less than 10% and improve the overall production numbers within his sales territory.[2] (AF. No. 20). Plaintiff's numbers did not significantly improve and on September 2, 2003, Hart sent an e-mail to Plaintiff acknowledging that Plaintiff did not meet the return percentage goals and reminding him to set his September 2003 return rate goal at 10%. (AF. No. 21). Plaintiff admitted, that as of September 2, 2003, he had not reviewed and signed-off on some of the packages as he was directed to do. (AF. No. 60).

On September 8, 2003, Plaintiff sent an e-mail to Hart and Centrix President Gerry Fitzgerald ("Fitzgerald") complaining that Murray had been harassing him in the performance of his job duties. (AF. No. 22). Plaintiff admitted sending the September 8, 2003 e-mail and acknowledged that the e-mail discussed harassment of Plaintiff by Murray without reference to Plaintiff's age and/or disability. (AF. No. 61). Plaintiff further admitted that he was not disciplined or reprimanded as a result of sending the e-mail and that he was, in fact, given a new supervisor the next day. (AF. No. 62). The e-mail specifically detailed Murray's alleged harassing conduct, but did not suggest that Murray's alleged conduct was based on Plaintiff's age or any perceived disability. (AF. No. 23). The e-mail was forwarded to Mary Graves ("Graves") and Johnson in Centrix Human Resources. On September 9, 2003, Plaintiff's direct supervisor was changed to Regional Sales Manager, Sharon Brooks ("Brooks"). (AF. No. 24). When Brooks was notified of the change, she was told that Centrix wanted to give Plaintiff a "clean slate" with a new supervisor. (AF. No. 25). Upon being assigned to Plaintiff, Brooks expressed her desire to help Plaintiff succeed, and informed him of her

---

[2]Plaintiff acknowledged that he received a June 13, 2003 e-mail from Heidi Johnson (Deutschmann) in which Plaintiff was directed to review and sign off on the dealer packages of certain problem dealers to ensure the packages were not returned for missing "stips," and that he received a July 23, 2003 e-mail from Wes Hart directing Plaintiff to bring his return ratio, due to missing "stips," down below 10%. (Exhibit 3, pp. 120-122, 128-130).

performance expectations and that she would be following up with his dealerships from time to time. (AF. No. 26).

After Brooks took over as his supervisor in September 2003, Plaintiff was required to continue submitting daily call logs, and that Brooks expected those logs to be accurate and truthful. (AF. No. 63). After monitoring Plaintiff's sales volume and "stip" return ratio numbers for a few months, and randomly checking with dealerships, Brooks felt that Plaintiff was not maintaining consistent contact with the dealerships and providing training to them. (AF. No. 27). In January 2004, Brooks developed a 90-day action plan for Plaintiff outlining specific goals and actions with regard to: (1) increasing volume; (2) building relationship with existing dealerships; and (3) training dealership personnel to reduce errors. (AF. No. 28). Brooks forwarded the plan via e-mail to Plaintiff on January 15, 2004 requesting a response by the following Monday, but Plaintiff did not respond. (AF. No. 29). Plaintiff admitted that he received Brooks 90-day plan in January 2004 and that the plan appeared to be reasonable. (AF. No. 64). Plaintiff further admitted that he did not object to the 90-day plan at the time, and that he understood that if he did not make acceptable progress in attaining the goals set in the plan he was subject to termination. (AF. No. 65).

Brooks continued to monitor Plaintiff's numbers and contact dealerships regarding Plaintiff's service. (AF. No. 30). Plaintiff's annual performance review prepared by Brooks on January 29 and 30, 2004 stated that Plaintiff's volume had dropped; that his "stip" return ratios had involved too much effort from company buyers instead of his own effort; and that he did not maintain adequate contact with the dealerships in his territory. (AF. No. 31). Plaintiff agreed that as a Centrix dealer representative he was responsible for selling loans, training dealership personnel on the Centrix program and monitoring the dealerships to make sure that loans were not returned for lack of

6

information. (AF. No. 52). Plaintiff admitted that he was frequently contacted by Denver personnel regarding his dealerships failing to provide information, and that he was ultimately responsible for the lack of information because he failed to properly train dealership personnel and collect "stips." (AF. No. 55).

During a routine contact with dealerships in early February 2004, Brooks discovered that at least some of the information on Plaintiff's most recent call logs could not be verified by dealership representatives. (AF. No. 32). Brooks then reviewed Plaintiff's daily log for January 26, 2004 through January 31, 2004, called the dealerships listed, and discovered that in many instances Plaintiff either had not visited the dealerships at all as stated in the log or had very briefly "stopped in." (AF. No. 33). After Brooks[3] contacted Johnson in Human Resources on February 5, 2005, the two decided to investigate further by reviewing some of Plaintiff's other call logs and contacting the dealerships together. (AF. No. 34). Each of the call logs investigated contained some statements and information about Plaintiff's visits that could not be confirmed by dealership personnel. (AF. No. 35). After Human Resources Vice President Graves, Centrix President Fitzgerald, and Centrix Vice President Hart were informed of the situation, it was decided that Plaintiff's employment would be terminated based upon Plaintiff's previous May 2003 write-up, his inaccurate log reports and his continuing performance shortfalls. (AF. No. 36). Plaintiff was notified of his termination and the reasons for the termination on March 2, 2004 via teleconference with Johnson and Brooks. (AF. No. 37). Plaintiff claims he does not remember if Brooks or Johnson told him the grounds for his termination. (AF. No. 66). At no time — prior to or after his termination — did Plaintiff ever report

---

[3]Plaintiff agreed that Brooks, his last supervisor for the six months prior to his termination, did not harass him or discriminate against him. (Exhibit 3, pp. 112-114).

7

discriminatory treatment by any of his supervisors or co-workers to the Human Resources Department as provided in the Employer Handbook. (AF. No. 38).

Plaintiff was 53 years of age when he was hired by Centrix in February 2002 and he was 55 years old at the time of his Discharge from Centrix in March 2004. (AF. No. 47). Plaintiff suffered a stroke in 1995 that resulted in some left sided extremity weakness, but he was never given any physical restrictions or activity limitations from his treating doctors. (AF. No. 48). Plaintiff testified that because of this weakness he cannot play golf or tennis as well as he used to before the stroke; that he walks with a slight left-sided limp; and that he has more difficulty getting in and out of his car. (AF. No. 49). Plaintiff remembered listing the 1995 stroke on a Centrix health insurance application, but did not specifically remember discussing the stroke with any Centrix management other than his original manager, Don Faulkner. (AF. No. 50). Plaintiff did not remember requesting special accommodations for his alleged disability from any Centrix personnel, either orally or writing. (AF. No. 51). Although Plaintiff testified that he feels that Murray was overly critical of his job performance, he could not remember when (or in what ways) Murray was critical. (AF. No. 56).

## DISCUSSION

Given that the facts offered by Defendant are not disputed and applying the summary judgment standard referenced above, the court concludes that Defendant has demonstrated that there are no genuine issues as to any material fact and that it is entitled to judgment as a matter of law. Plaintiff has not come forward with **any** evidence in response to Defendant's initial showing on summary judgment. Moreover, pursuant to the court's Scheduling Order (Doc. #7) entered on July 20, 2005, the deadline for Plaintiff to file his written opposition to summary judgment was on April

8

24, 2006, and he has not requested any extension of this date.[4] (*See* Doc. #7 at Appendix II at 1 ("The responsive submission of the party opposing the motion for summary judgment shall be filed not later than 21 days after the motion for summary judgment is filed.")). Therefore, Plaintiff has failed to meet his burden on opposition "to go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324, and the record demonstrates that summary judgment in favor of Defendant is appropriate.[5]

Alternatively, the court has reviewed Defendant's summary judgment motion and finds that there are no material issues of fact suggesting that Defendant impermissibly treated and/or fired Plaintiff on account of his age, disability, or with a retaliatory motive. Indeed, with the exception of his ADEA claim, there is no evidence Plaintiff is even able to satisfy each of the *prima facie* elements of his different claims.[6] For example, there is insufficient evidence to create a fact issue regarding whether Plaintiff had a disability under the ADA (*i.e.*, he was a qualified individual with

---

[4]On May 1, 2006, the court's law clerk contacted Plaintiff's counsel by telephone and spoke with him in an effort to obtain further clarification as to Plaintiff's position on summary judgment. Plaintiff's counsel indicated that he would likely be filing with the court a Rule 56(f) affidavit no later than May 2, 2006. However, after placing this call, the court has not received any further communication from Plaintiff's counsel or his office about opposing summary judgment and interprets the lack of any immediate follow up to mean that Plaintiff does not oppose the entry of an order granting summary judgment in Defendant's favor.

[5]The court has compared Defendant's statement of undisputed facts with the Rule 56 summary judgment record and finds that the facts relied upon by Defendant are indeed undisputed.

[6]In the present case, it is undisputed that there is no *direct* evidence showing that Plaintiff was discharged from Centrix because of his age or his alleged disability. In his deposition, Plaintiff admitted that none of his supervisors at Centrix ever made a comment about his age. He also admitted that he does not remember ever discussing his alleged disability with John Murray or Sharon Brooks. (Exhibit 3, pp. 87-88; 106). As Plaintiff has presented no direct evidence of discrimination, the court has applied the familiar standards found in *McDonnell Douglas, Burdine*, and their progeny.

9

a disability) nor is there any evidence that he engaged in any protected activity. Moreover, and in any event, there is no substantial evidence that any decision maker was aware that Plaintiff had a disability or that he engaged in any protected activity. For these reasons, Plaintiff cannot establish a *prima facie* case of disability discrimination or retaliation.

Even if Plaintiff could establish the *prima facie* elements with respect to each of his claims in this case, however, the undisputed evidence demonstrates that Defendant's treatment of and decision to fire Plaintiff were all premised upon legitimate non-discriminatory reasons, including poor work performance and violations of work rules. Once a plaintiff establishes a *prima facie* case of discrimination, the defendant must then articulate at least one legitimate non-discriminatory reason for the challenged employment action to obtain summary judgment. *Chapman*, 229 F.3d at 1021 (citing *Combs*, 106 F.3d at 1528). Defendant has met its "exceedingly light" burden of articulating legitimate, non-discriminatory reasons for discharging Plaintiff. *See Burdine*, 150 U.S. at 251-55. Therefore, any presumption of discrimination raised by the *prima facie* case is eliminated and Plaintiff is required to produce evidence that the reason or reasons given by Defendant were not the real reasons for the adverse employment decision. *Id.* Here, because the reasons stated by Defendant for Plaintiff's discharge involve the violation of a work rule, Plaintiff may show that Defendant's reasons are pretextual by offering evidence that: (1) he did not violate the cited work rule and Defendant knew that he did not violate the work rule;[7] or (2) if he did violate the rule, other

_____

[7] Even if Defendant was mistaken about Plaintiff's violation of a work rule, that is not enough to subject Defendant to liability. *See Damon*, 196 F.2d at 1363; *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1166, 1170 (11th Cir. 1991); *Smith v. Papp Clinic, P.A.*, 808 F.2d 1199, 1152-53 (11th Cir. 1987). A plaintiff must also present evidence that the defendant knew that the violation did not occur and, despite this knowledge, fired the employee based upon the false premise of an alleged work rule violation. *See Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1321 n.16 (11th Cir. 1998) (citing *Nix v. WLCY Radio/Rahal Communications*, 738 F.2d 1181 (11th Cir.

employees outside the protected class, who engaged in similar acts, were not similarly treated. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1351, 1363 (11th Cir. 1999).

In the present case, there is no evidence that Centrix's stated reasons for discharging Plaintiff are without credence. Indeed, undisputed evidence shows that Centrix's management had a reasonable belief that Plaintiff ignored the directives of his supervisors. He was counseled in May 2003 regarding his inaccurate log reports and his continuing poor performance. (Exhibit 4, pp. 197-200; Exhibit 1, Affidavit of Heidi Johnson-Johnson; Exhibit 2, Affidavit of Sharon Brooks). In both his May 2002 and February 2003 performance appraisals (which were given by two different supervisors), Plaintiff was told to spend more time training the dealership personnel within his territory to improve the "stip" return ratio. (Exhibit 4, pp. 297-98, 320-22). The Employee Counseling Notice issued by Johnson on May 8, 2003 placed Plaintiff on a 30-day probation because Plaintiff had not been collecting "stips" in a timely manner and because the information in Plaintiff's call logs was not accurate. (Exhibit 4, pp. 276-81; Exhibit 1, Affidavit of Heidi Johnson). During the May 9, 2003 conference call between Plaintiff, Johnson, and Murray, Plaintiff agreed that he would work harder at training dealers and follow up with "stips" on a daily basis. (Exhibit 4, pp. 276-81; Exhibit 1, Affidavit of Heidi Johnson). Then in his written reply to the Employee

1981)). As the Eleventh Circuit has stated:

> An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct. An employer "'may fire an employee for a good reason, a bad reason, a reason based on erroneous facts or for no reason at all, as long as *its action is not for a discriminatory reason.*'"

*Damon*, 196 F.3d 1351, 1363 (11th Cir. 1999) (citing *Jones*, 151 F.3d at 1324 n.16) (other citation omitted).

11

Counseling Notice, Plaintiff stated that he understood that the call logs should be done with complete accuracy in the future. (Exhibit 4, 276-81; Exhibit 1, Affidavit of Heidi Johnson). Murray and Johnson discussed the issue of Plaintiff's "stip" return goals with him during the June 19, 2003 conference call and Plaintiff agreed that he would review and sign off on customer funding packages at problem dealerships. (Exhibit 4, pp. 221; Exhibit 1, Affidavit of Heidi Johnson). Despite the fact that Plaintiff was given a list of problem dealerships on or about June 23, 2003, his numbers failed to improve and he was sent the July 2003 e-mail in which Hart told him that his return ratios were too high and needed to be below 10%. (Exhibit 4, pp. 219-59, 263). In his deposition, Plaintiff admitted that as of September 2, 2003, he had not reviewed and signed off on some of the packages as he was directed to do. (Exhibit 3, pp. 123-25).

Even after Brooks replaced Murray as Plaintiff's supervisor in September 2003, Plaintiff's return ratios did not significantly improve. (Exhibit 2, Affidavit of Sharon Brooks). In another effort to help Plaintiff improve his job performance, Brooks issued the 90-day plan in mid January 2004 outlining specific goals to increase sales volume, build relationships with existing dealers, and to train dealership personnel to help reduce errors and decrease "stip" return ratios. (Exhibit 4, pp. 171-75; Exhibit 2, Affidavit of Sharon Brooks). In Plaintiff's annual performance review given at the end of January 2004, Brooks noted that he was still not maintaining sufficient contact with his dealerships. (Exhibit 4, pp. 179-81; Exhibit 2, Affidavit of Sharon Brooks). Then in a routine check in early February 2004, Brooks learned that Plaintiff's visits to certain dealerships as listed on his call log could not be verified by a dealership's representative. (Exhibit 4, pp. 183-86; Exhibit 2, Affidavit of Sharon Brooks). Further investigation by Brooks, Johnson, and Graves revealed a pattern in which Plaintiff's call logs indicated visits to various dealerships that could not be verified

12

by other dealers' representatives. (Exhibit 4, pp. 182-92; Exhibit 1, Affidavit of Heidi Johnson; Exhibit 2, Affidavit of Sharon Brooks). After Hart and Fitzgerald were advised of the situation, officials in the Human Resources Department and Brooks decided to terminate Plaintiff's employment. That decision was approved by two senior Centrix officials. (Exhibit 4, pp. 182-92; Exhibit 1, Affidavit of Heidi Johnson; Exhibit 2, Affidavit of Sharon Brooks).

Although Plaintiff denies that he performed poorly, the evidence that he was continually counseled for his performance is undisputed. In his deposition, Plaintiff admitted that he was counseled about the "stip" return issue in May 2003, and agreed that he received numerous communications regarding his poor "stip" return ratio numbers. (Exhibit 3, pp. 117-26). He also admitted that in September 2003 he had not properly signed off on funding packages as he was instructed to do previously in June 2003 (Exhibit 3, pp. 119-18), and that he did not recall voicing any objection to the January 13, 2004, 90-day action plan. (Exhibit 3, pp. 147-51). Plaintiff readily admitted that he understood the importance of maintaining accurate call logs and was counseled by at least two of his supervisors about maintaining accurate call logs. (Exhibit 3, pp. 110-18).

Finally, Plaintiff testified that he did not believe Brooks discriminated against him, and that the only basis for his belief that Murray did so was the fact that he (Plaintiff) believed that he was the oldest dealer representative in the country. (Exhibit 3, pp. 102, 110-14). Plaintiff admitted that no one ever commented about his age and that he had no other verbal or written evidence showing that he was harassed or discharged because of his age. (Exhibit 3, pp. 102-05). Centrix's documentation, along with Plaintiff's lack of evidence that he was harassed and/or discharged because of his age, establishes that Plaintiff was discharged for legitimate non-discriminatory reasons, and Plaintiff has failed to show those reasons were a pretext for discrimination or retaliation.

13

Moreover, there is no evidence in the record that the explanations provided by Defendant for its actions toward Plaintiff are somehow a pretext for discriminatory and/or retaliatory conduct. In fact, there is ample deposition testimony — including the testimony of Plaintiff himself — that supports Defendant's non-discriminatory bases for its treatment of him. Therefore, Defendant has shown it is entitled to judgment as a matter of law on Plaintiff's age discrimination, disability discrimination, and retaliation claims.

Accordingly, Defendant's Motion for Summary Judgment is due to be granted. The court will enter an Order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this ___31st___ day of May, 2006.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

14